UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------X
                                    x
In re GRAND THEFT AUTO VIDEO GAME   x   06 Md. 1739 (SWK)(MHD)
CONSUMER LITIGATION (No. II)        x
                                    x
-----------------------------------X   **OPINION AND ORDER**
This Document Relates to:           x
              All Actions   x
-----------------------------------X

**SHIRLEY WOHL KRAM, U.S.D.J.**

On December 4, 2007, the Court conditionally certified a settlement class and preliminarily approved a settlement resolving the multidistrict, consumer-fraud litigation filed against the defendants, Take-Two Interactive Software, Inc. ("Take-Two") and Rockstar Games, Inc. ("Rockstar"). The litigation involves claims brought under the consumer-protection laws of the fifty states and the District of Columbia, in connection with the defendants' inclusion of an interactive, sexual minigame (the "Sex Minigame") in their premier product, Grand Theft Auto: San Andreas ("GTA:SA"). In light of the Second Circuit's recent decision in McLaughlin v. American Tobacco Company, 522 F.3d 215 (2d Cir. 2008), the Court now decertifies the settlement class.

## I. Background

Beginning in the summer of 2005, four actions were brought in the Southern District of New York against Take-Two and its wholly-owned subsidiary, Rockstar, alleging violations of state

consumer-protection laws. <u>See</u> 05 Cv. 6734 (SWK) (MHD); 05 Cv. 6767 (SWK) (MHD); 05 Cv. 6907 (SWK) (MHD); 05 Cv. 10013 (SWK) (MHD).[1] On February 15, 2006, the United States Panel on Multidistrict Litigation (the "MDL Panel") transferred these four actions, as well as an additional action pending in the Southern District of Illinois, to Judge Barbara Jones for consolidated pretrial proceedings. 06 Md. 1739 (SWK) (MHD), Dkt. No. 1. On April 17, 2006, Chief Judge Mukasey reassigned these five cases to this Court. 06 Md. 1739 (SWK) (MHD), Dkt. No. 8. The MDL Panel subsequently transferred two additional, related actions, originating in the Central District of California and the Eastern District of Pennsylvania, respectively, to this Court for consolidated treatment with those cases already pending here. 06 Md. 1739 (SWK) (MHD), Dkt. Nos. 17, 74. Together, these seven actions comprise the instant multidistrict litigation.

Before any of these actions were transferred to this Court, Judge Jones referred the matter to Magistrate Judge Dolinger for the resolution of general pretrial issues. <u>See</u> O5 Cv. 6734 (SWK) (MHD), Dkt. Nos. 8, 10. In an order filed on May 1, 2006, Magistrate Judge Dolinger appointed Seth R. Lesser, Esq. of

---

[1] The case captioned <u>Casey v. Take-Two Interactive Software, Inc.</u>, originated in the <u>Eastern District of Pennsylvania</u>, and was transferred to the Southern District of New York on November 29, 2005. <u>See</u> 05 Cv. 10013 (SWK) (MHD), Dkt. No. 1.

Locks Law Firm, PLLC, as Lead Counsel for the putative class. See 06 Md. 1739 (SWK) (MHD), Dkt. No. 15. On June 8, 2006, Lead Counsel filed a consolidated amended complaint (the "AC"), which sets forth the most recent allegations underlying this litigation. See 06 Md. 1739 (SWK) (MHD), Dkt. No. 18.

The AC alleges that the defendants marketed and sold GTA:SA under an improper content rating, which the defendants obtained only by withholding pertinent information from the entity charged with assigning content ratings to video games, the Entertainment Software Ratings Board (the "ESRB"). (AC ¶ 1.) In particular, the AC charges that the defendants failed to disclose to the ESRB that GTA:SA's underlying code contained the Sex Minigame (AC ¶ 49), a game-within-the-game that allowed players to control the protagonist's movements as he engaged in various sexual acts (AC ¶ 38). The Sex Minigame could be accessed through the use of a modification ("mod") (AC ¶ 37), which came to be known as the "Hot Coffee Mod" (AC ¶ 36). Though the use of mods ("modding") may violate GTA:SA's End User License Agreement (AC ¶¶ 37, 46), the AC alleges that the development of the Hot Coffee Mod was foreseeable, both because the defendants actively encourage modding (AC ¶ 37), and because the gaming community regularly engages in modding (AC ¶ 42). After its development, the Hot Coffee Mod circulated widely throughout the gaming community and spawned a substantial public

outcry (AC ¶ 44), which ultimately prompted the ESRB to change GTA:SA's content rating from "Mature" ("M") to "Adults Only" ("AO") (AC ¶ 52). On the basis of the foregoing factual allegations, the AC asserts that the defendants misrepresented GTA:SA's content in violation of the consumer-fraud, implied-warranty, and unjust-enrichment laws of the fifty states and the District of Columbia. (AC ¶¶ 62-81.)

In a motion filed on July 31, 2006, the defendants moved to dismiss all claims advanced under the laws of states where the named plaintiffs did not purchase GTA:SA. See 06 Md. 1739 (SWK) (MHD), Dkt. Nos. 21-22. The Court denied the defendants' motion on October 25, 2006, ruling that class certification was logically antecedent to the standing issues raised therein. See In re Grand Theft Auto Video Game Consumer Litig., 06 Md. 1739 (SWK) (MHD), 2006 WL 3039993, at *3 (S.D.N.Y. Oct. 25, 2006). Thereafter, class-certification discovery commenced under the direction of Magistrate Judge Dolinger. (Mot. Final Settlement Approval, Declaration of Seth R. Lesser ("Lesser Decl.") ¶ 9k.) On January 24, 2007, the plaintiffs filed a motion for certification of a nationwide class composed of all purchasers of GTA:SA from its initial release until July 20, 2005. See 06 Md. 1739 (SWK) (MHD), Dkt. No. 60. The defendants filed an opposition to class certification on June 8, 2007, challenging the propriety of a nationwide class action that asserts claims

under the disparate laws of the fifty states. <u>See</u> 06 Md. 1739 (SWK) (MHD), Dkt. No. 90.

The Court granted several extensions of time for the filing of the plaintiffs' reply brief in support of their motion for class certification in order to allow the parties an opportunity to engage in settlement negotiations under the aegis of Magistrate Judge Dolinger. <u>See, e.g.</u>, 06 Md. 1739 (SWK) (MHD), Dkt. Nos. 96, 97, 98, 100. On November 19, 2007, after substantial settlement negotiations, the plaintiffs filed a settlement agreement (the "Settlement"), proposed notice, and proposed definition of a settlement class (the "Settlement Class"[2]). <u>See</u> 06 Md. 1739 (SWK) (MHD), Dkt. No. 106, Exs. 1, 1-C. The Court held a preliminary fairness hearing on November 28, 2007. Following that hearing, the Court issued an order conditionally certifying the Settlement Class, appointing Lead Counsel as counsel for the Settlement Class, naming class representatives (the "Class Representatives"), and preliminarily

---

[2] The Settlement Class is composed of

all natural persons or entities in the United States who purchased a GTA:SA First Edition Disc, except for authorized resellers of the game, [the defendants'] current or former employees, any persons or entities that have previously executed releases discharging [the defendants] from liability concerning or encompassing any or all claims that are the subject of the [AC], between August 2004 and [December 4, 2007].

<u>See</u> Settlement II.G.

approving the Settlement and proposed notice. 06 Md. 1739 (SWK) (MHD), Dkt. No. 109 (the "Hearing Order"). The Court also appointed Kostas Katsiris, Esq. to serve as special master for purposes of overseeing the administration of the Settlement and publication of notice, and reviewing Lead Counsel's request for attorney's fees. 06 Md. 1739 (SWK) (MHD), Dkt. No. 108.

The Settlement provides benefits to those purchasers of GTA:SA who swear under penalty of perjury that they: (1) bought GTA:SA prior to July 20, 2005; (2) were offended by consumers' ability to modify GTA:SA in order to access the Sex Minigame; (3) would not have purchased GTA:SA had they known that consumers could so modify the game's content; and (4) would have returned GTA:SA to its place of purchase upon learning that the game could be modified, if they thought they could obtain a refund (collectively, the "Eligibility Averments"). See Settlement II.I. There are two kinds of benefits available under the Settlement: First, under the "Exchange Program," Settlement Class members may return their GTA:SA disc for a disc that does not include the Sex Minigame. See Settlement III.B. Second, under the "Benefit Program," Settlement Class members may be eligible for cash payments in an amount ranging between $5 and $35, depending on the quality of proof of purchase they are able to provide. See Settlement III.C. The Settlement places a ceiling of $2.75 million upon the defendants' total out-of-

pocket expenses,[3] see Settlement III.E, and a floor of $1.025 million,[4] see Settlement III.H.

Although the Settlement does not fix an amount for attorney's fees, the proposed notice, which was filed in conjunction with the Settlement, indicated that the plaintiffs' attorneys would request a fee of $1 million. See 06 Md. 1739 (SWK) (MHD), Dkt. No. 106, Ex. 1-C.

The procedure the Court approved for noticing Settlement Class members consisted of several prongs, including, (1) e-mailing the full settlement notice to those individuals on Rockstar's e-mail mailing list; (2) posting a link to the full settlement notice on Take-Two's official website and on the Settlement Website set up for this litigation; (3) publishing the summary settlement notice in several periodicals and on various websites; and (4) posting a link to the full and summary

---

[3] The defendants' out-of-pocket expenses include: (1) $15 for each disc returned under the Exchange Program, see Settlement III.B.6; (2) the face value of all cash payments made under the Benefits Program, see Settlement III.E; and (3) reasonable fees paid to Special Master Katsiris, see Hearing Order 3-4. In the event that the value of filed claims exceeds $2.75 million, the Settlement provides for the pro rata reduction of payments under the Benefits Program. See Settlement III.F. Nevertheless, the Settlement obligates the defendants to satisfy all claims made under the Exchange Program. See Settlement III.F.

[4] If the defendants' out-of-pocket expenses fall below $1.025 million, the Settlement requires that they make charitable contributions in an amount equal to the difference between $1.025 million and the total payments theretofore made by the defendants. See Settlement III.H.

settlement notices on websites maintain by the plaintiffs' attorneys. <u>See</u> Hearing Order 5-6. The defendants retained Rust Consulting, Inc. ("Rust") to carry out the approved notice, under the supervision of Special Master Katsiris, <u>see</u> Hearing Order 3. <u>See also</u> 06 Md. 1739 (SWK) (MHD), Dkt. No. 111 (detailing defendants' compliance with approved notice).

During the pendency of the claims period, Special Master Katsiris regularly updated the Court on the implementation of the approved notice and on Settlement Class members' response to the Settlement. On June 25, 2008, the Special Master testified that the Settlement Website had received over 100,000 hits, and that some 2700 individuals had filed claims under the Settlement, for a total estimated recovery of $20,000. (Tr. 6, June 25, 2008.) The vast majority of claimants had discarded their copy of <u>GTA:SA</u> and submitted no proof of purchase, making them eligible for at most five dollars. Because the total value of filed claims failed to reach the $1.025-million Settlement floor, Lead Counsel proposed that the National Parent Teachers' Association and the ESRB receive the charitable contributions provided for by the Settlement. (Mot. Final Settlement Approval 2.)

The Court received four objections to the Settlement (Lesser Decl. ¶ 25), only three of which even incidentally

addressed its fairness to members of the Settlement Class.[5] On June 25, 2008, the Court held a final fairness hearing, during which it allowed interested parties to address the fairness of the Settlement and the propriety of counsel's fee request. Theodore H. Frank ("Frank"), one of the four objectors, was the only member of the Settlement Class to appear at the hearing. After affording Frank an opportunity to explain the reasons for his objection, the Court addressed several questions to the parties and permitted them to make closing statements on the Settlement's fairness. (Tr. 8-28, June 25, 2008.) The Court reserved judgment on the final certification of the Settlement Class and on the fairness of the Settlement.

## II. Discussion

In order to obtain final certification of the Settlement Class, the plaintiffs must show that the Class meets the four criteria of Federal Rule of Civil Procedure 23(a), i.e., (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation, and that the action is maintainable under one of the subsections of Rule 23(b). See McLaughlin, 522 F.3d at 222. Here, because the plaintiffs seek certification under Rule

---

[5] One of the objections was submitted by an individual who claimed to be a minor at the time he purchased GTA:SA, and stated that he was offended by the Sex Minigame. Given its substance, this objection seems best read as a deficient claim under the Settlement, rather than as an objection to the Settlement's terms.

23(b)(3), they must show that "questions of law or fact common
to [Settlement Class] members predominate over any questions
affecting only individual members," and that the class action
"is superior to other available methods for fairly and
efficiently adjudicating the controversy." Fed. R. Civ. P.
23(b)(3). The existence of the Settlement is relevant to the
Court's inquiry. In particular, the Court need not consider
whether the Settlement Class would present intractable, trial
manageability problems under Rule 23(b)(3)(D), "for the proposal
is that there be no trial." Amchem Prods., Inc. v. Windsor, 521
U.S. 591, 620 (1997). Trial-manageability issues aside, however,
the "requirements [of Rule 23(a) and (b)] should not be watered
down by virtue of the fact that the settlement is fair or
equitable." Denney v. Deutsche Bank AG, 443 F.3d 253, 270 (2d
Cir. 2006) (citation omitted).

        The ensuing analysis demonstrates that the plaintiffs have
failed to satisfy the predominance requirement of Rule 23(b)(3).
As a preliminary matter, the Court holds in Part II.A, infra,
that each Settlement Class member's consumer-protection claims
are governed by the law of the state where he purchased GTA:SA.
Therefore, Settlement Class members' claims arise under the
consumer-protection laws of all fifty states and the District of
Columbia. Moreover, under the law of at least some of these
states, reliance is an element of consumer fraud. Because

reliance is an element of many Settlement Class members' fraud claims, this case is on all fours with the Second Circuit's recent decision decertifying a nationwide class of "Light"-cigarette smokers because their civil-RICO claims required a showing of individualized reliance, McLaughlin, 522 F.3d at 222-25. Moreover, for reasons stated fully in Part II.B.2, the Settlement Class is rife with substantial individualized issues other than the reliance issues that required decertification in McLaughlin. Accordingly, the Court decertifies the Settlement Class on the grounds that common issues do not predominate over individualized issues.

### A. Choice of Law

Before addressing whether the plaintiffs have met the predominance requirement, the Court must determine which states' laws properly apply to the plaintiffs' various claims for relief. In analyzing putative, nationwide, consumer-protection class actions, several courts have determined that the law of the state where each plaintiff resides and purchased the relevant product should apply. See, e.g., In re Gen. Motors Corp. Dex-Cool Prods. Liability Litig., 241 F.R.D. 305, 316-19 (S.D. Ill. 2007) (determining that law of state where each plaintiff resides should apply to claims for breach of warranty); Chin v. Chrysler Corp., 182 F.R.D. 448, 457 (D.N.J. 1998) (deciding that law of each plaintiff's home state should

apply to claims for fraud and breach of warranty); In re Ford Motor Co. Ignition Switch Prods. Liability Litig., 174 F.R.D. 332, 347-48 (D.N.J. 1997) (holding that law of each plaintiff's home state should apply to claims for fraud, breach of warranty, and other consumer-protection violations).[6] The plaintiffs argued in their brief in support of the certification of a nationwide litigation class that the Court should apply (1) New York General Business Law § 349 to their claims for consumer fraud (Pls.' Mot. Class Cert. 31-33); (2) Section 2-314(1) of the Uniform Commercial Code ("UCC") to their claims for breach of implied warranty (Pls.' Mot. Class Cert. 34-37); and (3) New York common law to their claims for unjust enrichment (Pls.' Mot. Class Cert. 26-29). For the reasons that follow, however, the Court holds that it must apply the law of the state wherein each Settlement Class member purchased his copy of GTA:SA.

There is no dispute that the plaintiffs' various claims for relief arise under state law. See Erie R. Co. v. Tompkins, 304 U.S. 64, 78 (1938) ("Except in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state."). Under such circumstances, a federal court generally must apply the choice-of-law principles of the state in which it sits. See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941) ("The conflict of laws rules

---

[6] See infra note 12.

to be applied by the federal court in Delaware must conform to those prevailing in Delaware's state courts."). Nevertheless, "[w]hen an action is transferred as part of an MDL, the transferee court applies the choice of law rules of the state in which the action first was filed." In re Rezulin Prods. Liab. Litig., 390 F. Supp. 2d 319, 329 (S.D.N.Y. 2005) (citations omitted). Here, because the various cases comprising this multidistrict litigation were brought in New York, Pennsylvania, California, Illinois, and Minnesota, the Court must apply the conflicts rules of each of these states to the cases arising therefrom.[7] As the following discussion demonstrates, New York's conflicts rules mandate the application of the law of the state where each Settlement Class member purchased GTA:SA, and the conflicts jurisprudence of Pennsylvania, California, Illinois, and Minnesota demands the same result.

### 1.    New York Conflicts Analysis

In New York, "[t]he first step in any case presenting a potential choice of law issue is to determine whether there is an actual conflict between the laws of the jurisdictions involved." In re Allstate Ins. Co., 613 N.E.2d 936, 937 (N.Y. 1993). An actual conflict is present "[w]here the applicable law

---

[7] Despite some superficial similarity among the conflicts rules of these states, the Court has no occasion to evaluate the plaintiffs' contention (Pls.' Mot. Class. Cert. 27 n.11) that the rules are essentially uniform.

from each jurisdiction provides different substantive rules." Curley v. AMR Corp., 153 F.3d 5, 12 (2d Cir. 1998). Here, the Court finds that there are actual conflicts among at least some of the states' various consumer-protection laws, and that these conflicts are potentially relevant to the case at hand.

Most of the courts that have addressed the issue have determined that the consumer-fraud and breach-of-warranty laws in the fifty states differ in relevant respects. See, e.g., Thompson v. Jiffy Lube Int'l, Inc., 05 Cv. 1203 (WEB), --- F.R.D. ----, 2008 WL 2762187, at *17 (D. Kan. July 16, 2008) (consumer-fraud laws); Dex-Cool, 241 F.R.D. at 319-21 (warranty laws); Chin, 182 F.R.D. at 457-61 (consumer-fraud and warranty laws); Ford Ignition Switch, 174 F.R.D. at 349-51 (consumer-fraud and warranty laws). As the Court's discussion infra, Part II.B.2.b, demonstrates, there are many relevant differences in the states' consumer-fraud and warranty laws.[8] Because these

---

[8] For example: (1) some states require a showing of reliance to state a claim for consumer fraud, while others do not; (2) some states require no proof of scienter to make out a claim for consumer fraud, while those requiring proof of scienter vary as to the level of proof demanded; (3) some states require proof of an ascertainable monetary loss to succeed on a claim for consumer fraud, while at least one requires no such proof; (4) some states bar the maintenance of consumer-fraud class actions, while others expressly provide for class-action litigation; (5) some states impose special notification requirements on consumer-fraud actions, while others do not; and (6) many states require proof of privity to state a claim for breach of warranty, while many others require no such proof. See infra Part II.B.2.b.

differences are all relevant--indeed, some of them are outcome determinative, see infra note 18--there are actual conflicts among the states' consumer-fraud and warranty laws.

Likewise, several courts have determined that the states' unjust-enrichment laws vary in relevant respects. See, e.g., Thompson, 2008 WL 2762187, at *18 (enumerating differences in states' unjust-enrichment laws); In re Sears, Roebuck & Co. Tools Mktg. & Sales Practices Litig., 05 Cv. 4742, 05 Cv. 2623, 2006 WL 3754823, at *1 n.3 (N.D. Ill. Dec. 18, 2006) (same); Clay v. Am. Tobacco Co., 188 F.R.D. 483, 501 (S.D. Ill. 1999) (same). Without adopting all of the reasoning in these cases,[9] the Court is nonetheless persuaded that there are relevant conflicts in the states' unjust-enrichment laws. First, the states' laws differ with respect to whether a complainant must prove an actual loss or impoverishment in order to state a claim for unjust enrichment. Compare Cmty. Guardian Bank v. Hamlin,

---

[9] The Clay decision, which has generated much of the case law finding relevant differences in the states' laws of unjust enrichment, see, e.g., Thompson, 2008 WL 2762187, at *18; Kelley v. Microsoft Corp., 07 Cv. 475 (MJP), 2008 WL 509332, at *4 (W.D. Wash. Feb. 22, 2008) Sears Tools, 2006 WL 3754823, at *1 n.3; Lilly v. Ford Motor Co., 00 Cv. 7372, 2002 WL 507126, at *2 (N.D. Ill. Apr. 3, 2002), notes that some states permit a claim for unjust enrichment only when there is no adequate remedy at law, Clay, 188 F.R.D. at 501. The Clay decision, however, fails to identify any state that would allow recovery on a claim for unjust enrichment when there was an adequate remedy at law. Likewise, the Clay decision notes that many states allow a defense of unclean hands, id., but fails to identify any state that would not allow such a defense.

898 P.2d 1005, 1008 (Ariz. Ct. App. 1995) (listing "impoverishment" as element of unjust enrichment) with Bouchard v. Price, 694 A.2d 670, 673 (R.I. 1997) (stating elements of unjust enrichment, but excluding impoverishment requirement). Here, as the Court discusses more fully, infra, Part II.B.2.a, Settlement Class members face substantial obstacles to proving that they actually suffered an ascertainable loss as a result of their purchase of GTA:SA, not least because many of them may not even be aware of the Sex Minigame's existence. Accordingly, insofar as the states' unjust-enrichment laws differ with respect to the impoverishment requirement, the laws differ in respects potentially relevant to the outcome of this case.

Second, the states' formulations of the doctrine of unclean hands, which may be a defense to unjust enrichment, differ significantly. See, e.g., Las Vegas Fetish & Fantasy Halloween Ball, Inc. v. Ahern Rentals, Inc., 182 P.3d 764, 767 (Nev. 2008) (indicating that unclean-hands doctrine requires two-part inquiry into egregiousness of misconduct and seriousness of harm caused); Retail Developers of Alabama, LLC v. East Gadsen Golf Club, Inc., --- So. 2d ----, 2007 WL 3409293, at *6 (Ala. Nov. 16, 2007) (indicating that only "morally reprehensible, willful misconduct" gives rise to unclean-hands defense); Thompson v. Orcutt, 777 A.2d 670, 676 (Conn. 2001) ("Unless the plaintiff's conduct is of such a character as to be condemned and pronounced

wrongful by honest and fair-minded people, the doctrine of unclean hands does not apply.") (internal quotation marks and citation omitted); <u>Rose v. Cain</u>, 544 S.E.2d 453, 457 (Ga. Ct. App. 2000) ("The unclean-hands maxim which bars a complainant in equity from obtaining relief has reference to an iniquity which infects the cause of action so that to entertain it would be violative of conscience.").[10] These differences are relevant to the instant case because Settlement Class members could not access the Sex Minigame unless they, or some third party other than the defendants, deliberately modified <u>GTA:SA</u>'s code, thereby potentially raising an unclean-hands defense.

Because there are relevant conflicts in the states' consumer-fraud, warranty, and unjust-enrichment laws, the Court must proceed to the second step of the choice-of-law inquiry. With respect to the plaintiffs' claims for consumer fraud, which sound largely in tort, the Court must determine which jurisdiction has the greatest interest in this litigation. <u>See GlobalNet Financial.Com, Inc. v. Frank Crystal & Co.</u>, 449 F.3d 377, 384 (2d Cir. 2006) (indicating that New York applies interest analysis in tort actions). With respect to the plaintiffs' claims for breach of warranty and unjust enrichment,

---

[10] Of course, these vague, equitable formulations may receive distinct interpretations depending upon local circumstances, thereby creating further possible differences in the states' unclean-hands doctrines.

the Court applies the law of the jurisdiction with the most
significant contacts to this dispute.[11] See, e.g., St. Charles
Cable TV, Inc. v. Eagle Comtronics, Inc., 687 F. Supp. 820, 826
(S.D.N.Y. 1988) (applying significant-contacts test to breach-
of-warranty claims); M'Baye v. N.J. Sports Prod., Inc., 06 Cv.
3439 (DC), 2007 WL 431881, at *10 (S.D.N.Y. Feb. 7, 2007)
(applying significant-contacts test to unjust-enrichment
claims).

---

[11] Because the plaintiffs' claims for unjust enrichment rest
upon the defendants' alleged fraudulent conduct, the claims may
to some extent sound in the tort of fraud, thereby necessitating
a torts conflicts-analysis. See, e.g., Hughes v. LaSalle Bank,
N.A., 419 F. Supp. 2d 605, 617 (S.D.N.Y. 2006) (applying torts
interest-analysis to claims for unjust enrichment not within
scope of contract's choice-of-law provision), vacated on other
grounds, 2007 WL 4103680 (2nd Cir. Nov 19, 2007). Nevertheless,
the Court concludes, infra, that the interest analysis favors
the application of the consumer-fraud law of each Settlement
Class member's state of purchase. For the same reasons, even if
the interest analysis were the proper doctrinal framework for
choosing the unjust-enrichment law applicable to this case, that
analysis would demand the application of the law of each
Settlement Class member's state of purchase, the same conclusion
the Court reaches under the significant-contacts approach.
    Likewise, one court in this District has applied the
Restatement (Second) of Conflict of Laws to choose the
applicable state law of unjust enrichment, on the grounds that
the claims of unjust enrichment in that case sounded neither in
tort nor contract. In re Rezulin Prods. Liab. Litig., 392 F.
Supp. 2d at 617-18 (applying significant-relationship test set
forward in Restatement (Second) of Conflict of Laws). Because,
for reasons clarified in the remainder of the Court's choice-of-
law analysis, the parties' relationship is centered in the state
of purchase, which is also the location of the act of alleged
enrichment, the Restatement (Second) would require the
application of the unjust-enrichment laws of the state of
purchase. See Restatement (Second) of Conflict of Laws § 221(2).
In short, as all three conflicts tests compel the same result,
it is ultimately irrelevant which one is applied.

In tort cases where conduct-regulating standards are at issue, courts generally apply the law of the state where the tort occurred, as that state usually has the greatest interest at stake in the litigation. GlobalNet Financial.Com, Inc., 449 F.3d at 384 (citations omitted). Here, for purposes of conducting the interest analysis, the fraud of which each Settlement Class member complains occurred in the state where he purchased his copy of GTA:SA. In particular, though portions of the defendants' allegedly deceptive marketing may have been conceived at the defendants' principal places of business in New York, the actual deception occurred at the time that each plaintiff purchased a copy of GTA:SA bearing an "M"-rating. See Goshen v. Mut. Life. Ins. Co., 98 N.Y.2d 314, 325-26 (N.Y. 2002) (finding that deception took place in state where plaintiffs purchased insurance policies, not in New York, where alleged fraudulent scheme was designed). Because the fraud at issue in this case occurred in the state of purchase, and as "[s]tates have a strong interest in protecting consumers with respect to sales within their borders, but they have a relatively weak interest, if any, in applying their policies to consumers or sales in neighboring states," In re Relafen Antitrust Litig., 221 F.R.D. 260, 278 (D. Mass. 2004) (citations omitted), the interest analysis favors the application of the consumer-fraud law of the state wherein each Settlement Class member purchased

his copy of GTA:SA. See, e.g., Chin, 182 F.R.D. at 457 (holding that fraud laws of each plaintiff's home state should apply); Ford Ignition Switch, 174 F.R.D. at 347-48 (same);[12] see also In re Relafen, 221 F.R.D. at 278 (in consumer-protection actions, "[t]he location of consumers' purchases thus assumes special significance").

    With respect to the plaintiffs' claims for breach of warranty and unjust enrichment, the Court applies the significant-contacts test, which focuses upon (1) the place of contracting, (2) the place of negotiation, (3) the place of performance, (4) the location of the subject matter, and (5) the domicile or place of business of the contracting parties. Zurich Ins. Co. v. Shearson Lehman Hutton, Inc., 642 N.E.2d 1065, 1068 (N.Y. 1994). Here, the first, second, third, and fourth factors clearly favor the application of the law of the state of purchase, for that is the situs of the parties' contracting,

_____

[12] These cases speak of the plaintiffs' "home state" in deciding which law should apply to consumer-protection claims. Nevertheless, they use the term "home state" loosely, in the sense that it is "the place where Plaintiffs reside, or the place where Plaintiffs bought and used their allegedly defective [products] or the place where Plaintiffs' alleged damages occurred." See, e.g., Chin, 182 F.R.D. at 457; Ford Ignition Switch, 174 F.R.D. at 348. The Court holds more precisely that the law of each Settlement Class member's state of purchase should apply to his claims. Even assuming that it is the law of each plaintiff's state of residence that governs, however, that would still necessitate the application of the laws of the fifty states and the District of Columbia, which defeats predominance for the reasons stated infra, in Part II.B.

negotiation, and performance on the sales contract for GTA:SA, and the location of the subject matter of that sales contract. Further, the fifth factor is neutral because the defendants have their principal place of business in New York, while most purchasers of GTA:SA are likely domiciled in the state of purchase. In light of the foregoing, the significant-contacts test requires the application of the law of the state of purchase to Settlement Class members' claims for breach of warranty and unjust enrichment. See, e.g., Dex-Cool, 241 F.R.D. at 316-19 (applying law of state where each plaintiff resides to breach-of-warranty claims); Chin, 182 F.R.D. at 457 (applying law of each plaintiff's home state to breach-of-warranty claims); Ford Ignition Switch, 174 F.R.D. at 347-48 (applying law of each plaintiff's home state to breach-of-warranty claims);[13] see also Restatement (Second) of Conflict of Laws § 188(3) ("If the place of negotiating the contract and the place of performance are in the same state, the local law of this state will usually be applied . . . .").

For the foregoing reasons, New York's conflicts jurisprudence demands that the Court apply the law of the state wherein each Settlement Class member purchased his copy of GTA:SA. Moreover, for the reasons set forth below, the same

---

[13] See supra note 12.

result applies under the conflicts jurisprudence of Pennsylvania, California, Illinois, and Minnesota.

### 2.    Pennsylvania Conflicts Analysis

Pennsylvania choice-of-law rules are similar to those that apply in New York. In particular, under Pennsylvania law, courts must first determine whether there is a true conflict among the relevant laws, in the sense that the conflict implicates the pertinent jurisdictions' legitimate interests. See Harsh v. Petroll, 840 A.2d 404, 418 (Pa. Commw. Ct. 2003). If a true conflict exists, courts must then apply the law of the state that has the greater interest in the application of its law. Id. (citing Ratti v. Wheeling Pittsburgh Steel Corporation, 758 A.2d 695, 702 (Pa. Super. 2000)).[14] In the instant case, the Court has already determined that there are relevant differences among the states' consumer-protection laws. Moreover, these relevant differences create "true conflicts" because each state has a compelling interest in having its own consumer-protection laws

---

[14] The "interest / contacts" approach applies to both tort and contracts cases. See Hammersmith v. TIG Ins. Co., 480 F.3d 220, 227-29 (3d Cir. 2007). As such, there is no need to analyze separately the application of Pennsylvania's choice-of-law principles to the plaintiffs' claims of consumer fraud, breach of warranty, and unjust enrichment. In any event, even assuming that certain considerations are relevant to a Pennsylvania contracts conflicts-analysis, but not relevant to a torts conflicts-analysis, the Court has already determined in its application of New York's choice-of-law principles that the law of the state of purchase has the most significant contacts with the sales contract into which Settlement Class members entered at the time they purchased GTA:SA.

applied to transactions occurring within its borders. Further, given the powerful state interest in regulating consumer purchases within the state's border, see, e.g., In re Relafen, 221 F.R.D. at 278, the state of purchase possesses the greatest interest in having its laws applied to Settlement Class members' claims. In consequence, Pennsylvania's conflicts jurisprudence also demands the application of the law of the state of purchase to Settlement Class members' claims. See Chin, 182 F.R.D. at 457 (employing New Jersey's choice-of-law principles, which also require balancing of interests, to conclude that warranty laws of each plaintiff's home state should apply); Ford Ignition Switch, 174 F.R.D. at 347-48 (same).[15]

### 3.    California Conflicts Analysis

California's choice-of-law principles are similar to those of Pennsylvania and New York. Courts begin by determining whether there are differences between the relevant laws, and if so, whether such differences give rise to a "true conflict." See Tucci v. Club Mediterranee, S.A., 107 Cal. Rptr. 2d 401, 407 (Cal. Ct. App. 2001). If there is such a "true conflict," courts in tort cases apply the law of the state whose interests would be more impaired if not applied, id., while courts in contracts cases apply the law of the state possessing the most significant contacts to the dispute, ABF Capital Corp. v. Berglass, 30 Cal.

---

[15] See supra note 12.

Rptr. 3d 588, 596 (Cal. Ct. App. 2005). Here, the Court has already determined that there are differences in the state's consumer-fraud, warranty, and unjust-enrichment laws that give rise to true conflicts. Further, the interests of the state of purchase would be most impaired if its consumer-fraud laws were not applied, and the state of purchase has the most significant contacts with the parties' sales contract for GTA:SA. Therefore, California conflicts jurisprudence also requires the application of the law of the state of purchase to Settlement Class members' claims.

### 4.   Illinois Conflicts Analysis

Illinois follows the Restatement (Second) of Conflict of Laws, see Townsend v. Sears, Roebuck & Co., 879 N.E.2d 893, 898-909 (Ill. 2007), which is similar in application to the choice-of-law rules of New York, Pennsylvania, and California. Under the Restatement, courts must first determine if there is an actual conflict in the relevant laws. Id. at 898. If there is such a conflict, courts then proceed to the second step of the analysis. In cases involving fraud and misrepresentation, such as this one, there is a presumption that the tort law of the state wherein the plaintiff received and relied upon the misrepresentation at issue will apply, if there is such a state. See Restatement (Second) of Conflict of Laws § 148(1). This presumption can be overcome only through a showing that some

other state has a more significant relationship to the occurrence and the parties, with respect to the particular issue in question. Id.; see also Townsend, 879 N.E.2d at 903 (rejecting proposition that similar provision of Restatement contemplates only a bursting-bubble presumption). In contracts cases, Illinois courts, like their counterparts in New York and California, apply the significant-contacts test. See United Farm Family Mut. Ins. Co. v. Frye, 887 N.E.2d 783, 788 (Ill. App. Ct. 2008) (citation omitted); see also Restatement (Second) of Conflict of Laws § 188.

As discussed above, there are actual conflicts in the states' consumer-fraud, warranty, and unjust-enrichment laws, which are relevant to the facts of this case. Further, each Settlement Class member received and relied upon the defendants' misrepresentation, if anywhere, in the state where he purchased his copy of GTA:SA, which creates a presumption that the consumer-fraud law of the state of purchase should apply. Given the strong state interest in policing consumer purchases within the state's borders, and the weak state interest in regulating consumer purchases outside those borders, In re Relafen, 221 F.R.D. at 278, there is no other state that has a closer relationship to the subject matter of this suit than each Settlement Class member's state of purchase. Likewise, the state of purchase has the most significant contacts to the parties'

sales contract for GTA:SA because that state is the situs of the contracting, negotiation, and performance of the sales contract. See Restatement (Second) of Conflict of Laws § 188(3). Accordingly, Illinois choice-of-law principles require the application of the consumer-fraud, warranty, and unjust-enrichment laws of the state wherein each Settlement Class member bought his game. See Dex-Cool, 241 F.R.D. at 315-18 (applying Illinois conflicts jurisprudence to find that law of state where each plaintiff resides applies to claims for breach of warranty); see also In re Pharm. Indus. Average Wholesale Price Litig., 230 F.R.D. 61, 82-83 (D. Mass. 2005) (applying Massachusetts conflicts jurisprudence, which is also based on Restatement (Second) of Conflict of Laws, to conclude that law of state where each plaintiff resides governs consumer-protection claims).[16]

### 5.   Minnesota Conflicts Analysis

Minnesota's choice-of-law principles are substantially different from those of New York, Pennsylvania, California, and Illinois, though their application leads to the same result in this case. Under Minnesota conflicts jurisprudence, courts must first determine whether a conflict exists between the relevant laws. See Jacobson v. Universal Underwriters Ins. Grp., 645 N.W.2d 741, 745 (Minn. Ct. App. 2002). If there is a conflict,

---

[16] See supra note 12.

courts must balance five choice-influencing factors, including "(1) Predictability of results; (2) Maintenance of interstate and international order; (3) Simplification of the judicial task; (4) Advancement of the forum's governmental interest; and (5) Application of the better rule of law." Nodak Mut. Ins. Co. v. Am. Family Mut. Ins. Co., 604 N.W.2d 91, 94 (Minn. 2000) (citations omitted).[17] Here, the Court has determined that there are actual conflicts between the relevant state consumer-protection laws.[18] Moreover, in the discussion that follows, the Court finds that the first and second choice-influencing factors weigh overwhelmingly in favor of the application of the law of each Settlement Class member's state of purchase, and the fourth factor concurs in that result. Though the third factor may tilt slightly in favor of Minnesota's law, the Court holds that the decisive weight of the first two factors, in combination with

---

[17] This two-part test applies in contracts and torts cases alike. See, e.g., Jepson v. Gen. Cas. Co. of Wis., 513 N.W.2d 467, 470 (Minn. 1994) (case with tort and contract components). Schumacher v. Schumacher, 676 N.W.2d 685, 689-92 (Minn. Ct. App. 2004) (tort case).

[18] Minnesota law requires that conflicts be outcome-determinative. See Nodak Mut. Ins. Co., 604 N.W.2d at 94. Because, as the Court discusses below, the individualized reliance issues found in some states' consumer-fraud laws preclude class certification under those states' laws, see infra Part II.B; and as the privity requirement found in some states' warranty laws bars the claims of many Settlement Class members, see infra Part II.B.2.b; and given that the laws of some states preclude the maintenance of a class-action suit for consumer fraud, see infra Part II.B.2.b, there are clearly outcome-determinative conflicts in the states' consumer-protection laws.

the fourth, requires the application of the law of the state of purchase in this case.[19]

The first choice-influencing factor measures the predictability of a given choice of law "before the time of the transaction or event giving rise to the cause of action." Danielson v. Nat'l Supply Co., 670 N.W.2d 1, 7 (Minn. Ct. App. 2003) (emphasis omitted). Generally, this factor is given little weight in tort cases involving accidents. Nodak Mut. Ins. Co., 604 N.W.2d at 94. Nevertheless, Settlement Class members' claims sound not only in tort, but also in contract. Moreover, insofar as the claims sound in the tort of fraud, they arise not from accidental contacts, but from transactions into which the parties deliberately entered. Under these circumstances, the parties had every reason to expect that the transactions underlying this litigation would be governed by the law of the state in which the transactions occurred. See Schumacher v. Schumacher, 676 N.W.2d 685, 690 (Minn. Ct. App. 2004) (finding in tort case that first factor was relevant because tort arose out of business activity). Therefore, the first factor favors the application of the law of the state of purchase.

The second choice-influencing factor evaluates whether the application of the forum state's law would manifest disrespect

---

[19] Courts generally give little weight to the better-rule-of-law factor, Nodak Mut. Ins. Co., 604 N.W.2d at 97, and the Court declines to apply it in this case.

for other states' laws. Nodak Mut. Ins. Co. 604 N.W.2d at 95. Although this factor "is generally not implicated if the state whose law is to be applied has sufficient contacts with and interest in the facts and issues being litigated," a state should not apply its own law if it "has little or no contact with a case and nearly all of the significant contacts are with a sister state." Hughes v. Wal-Mart Stores, Inc., 250 F.3d 618, 621 (8th Cir. 2001) (internal quotation marks and citations omitted). Here, Minnesota undoubtedly has contacts with and interests in the purchases Settlement Class members made within the state's borders. Nevertheless, Minnesota's interest in regulating purchases that took place outside its borders is minimal or non-existent, see In re Relafen, 221 F.R.D. at 278, especially because the defendants are not Minnesota corporations. Hence, the Court holds that the application of Minnesota's law--or the law of any state other than the state of purchase--to transactions that took place throughout the nation would constitute an unwarranted infringement upon other states' sovereignty. The second factor thus weighs in favor of applying the law of the state of purchase to each Settlement Class member's claims.

The third choice-influencing factor is largely concerned with the clarity of the relevant conflicting laws, Novak Mut. Ins. Co., 604 N.W.2d at 95, which is not an issue in the instant

case. Nevertheless, insofar as the application of the fifty states' laws would complicate the Court's task, this factor arguably weighs slightly in favor of applying Minnesota's law. See In re St. Jude Med., Inc., 01 Md. 1396 (JRT) (FLN), 2006 WL 2943154, at *6 (D. Minn. Oct. 13, 2006), overruled on other grounds In re St. Jude Med., Inc., 522 F.3d 836 (8th Cir. 2008).

The fourth factor requires an evaluation of Minnesota's governmental interest, relative to that of other states. See Nesladek v. Ford Motor. Co., 46 F.3d 734, 739-40 (8th Cir. 1995). In this context, "Minnesota places great value in compensating tort victims." Boatwright v. Budak, 625 N.W.2d 483, 489 (Minn. Ct. App. 2001) (citation omitted). Accordingly, Minnesota has an interest in having its own consumer-protection law applied if that law is beneficial to Settlement Class members. In this respect, it is significant that Minnesota does not require privity in order to state a claim for breach of implied warranty. See Indus. Graphics, Inc. v. Asahi Corp., 485 F. Supp. 793, 800 (D. Minn. 1980). Because Settlement Class members did not purchase GTA:SA directly from the defendants, the application of Minnesota's warranty laws would therefore be favorable to the Class.

The same cannot be said, however, for Minnesota's consumer-fraud laws. As the Court discusses below, the reliance requirement found in some states' consumer-fraud laws creates

30

individualized issues that bar certification of the Settlement Class. See infra Part II.B. Although Minnesota does not expressly require a showing of reliance in order to state a claim for consumer fraud, the Eighth Circuit recently determined that, at the very least, defendants could escape liability under Minnesota's consumer-fraud statute by showing that the plaintiffs did not rely upon the alleged misrepresentation at issue. In re St. Jude Med., Inc., 522 F.3d at 839-40. As a result, the Eighth Circuit decertified a nationwide class of purchasers to whom the lower court had decided to apply Minnesota law. Id. at 839-42. In light of the Eighth Circuit's recent decision, Minnesota's consumer-fraud laws are not especially favorable to Settlement Class members. Under these circumstances, the application of Minnesota's warranty laws would advance Minnesota's interest in compensating fraud victims, while the application of its consumer-fraud laws would not evidently advance that interest.

In addition to Minnesota's interest in compensating victims, the Court must also consider the other states' strong interest in having their consumer-protection laws applied to transactions that took place within their borders. In re Relafen, 221 F.R.D. at 278. After balancing these at-times competing interests, the Court finds that the fourth choice-influencing factor weighs in favor of applying Minnesota law

only to the claims of Settlement Class members who purchased GTA:SA within the state's borders.[20] See In re Baycol Prods. Litig., 218 F.R.D. 197, 207 (D. Minn. 2003) ("The advancement of the forum's governmental interest factor generally weighs in favor of application of the state law in which the plaintiff lives and in which the injury occurred."). Although, for reasons discussed infra, Part II.B., this determination ultimately precludes the certification of the Settlement Class, it does not bar Class members who purchased GTA:SA in Minnesota--precisely the Settlement Class members whom Minnesota has a strong interest in protecting--from advancing claims under Minnesota law in the future, and thus, the determination does not significantly undermine Minnesota's interests.

In light of the foregoing, the first and second choice-influencing factors decidedly favor the application of the law of the state of purchase, the fourth factor also favors that result, and the third factor only mildly opposes it. Therefore, Minnesota's choice-of-law jurisprudence demands the application of the law of the state wherein each Settlement Class member

---

[20] Even if the application of some other state's laws would advance Minnesota's interest in compensating tort victims, see Boatwright, 625 N.W.2d at 489 ("We have even refused to apply our law when the law of another state would better serve to compensate a tort victim.") (quotation and citation omitted), each state's interest in having its own consumer-protection laws applied to in-state transactions would trump Minnesota's interest in having that plaintiff-friendly state's laws applied.

purchased GTA:SA.[21] Cf. In re Baycol Prods. Litig., 218 F.R.D. at 207 (applying law of state where injury took place and plaintiffs resided to putative nationwide class asserting negligence claims).

In summary, the choice-of-law principles of New York, Pennsylvania, California, Illinois, and Minnesota all require the application of the law of the state of purchase to Settlement Class members' claims. Because this is a nationwide class action, the Court must therefore apply the laws of the fifty states and the District of Columbia.

**B. The Predominance Requirement**

Having determined that it must apply the law of the state of purchase to Settlement Class members' claims, the Court now

---

[21] One court has held that Minnesota's choice-of-law principles require the application of Minnesota's consumer-fraud laws to a nationwide, consumer-protection class action. In re St. Jude Med., Inc., 2006 WL 2943154, at *7. In that case, however, the defendant corporation was incorporated and headquartered in Minnesota, and also maintained its principal place of business in that state. See id. at *3. Moreover, substantially all of the corporate acts complained of occurred in Minnesota, and the product at issue was designed and manufactured in the state. Id. at *4. Here, the defendants possess no such close ties to Minnesota. Furthermore, the court's decision certifying a nationwide class action under Minnesota law was subsequently overturned. In re St. Jude Med., Inc., 522 F.3d at 839-42, though the Eighth Circuit did not reach the choice-of-law question, see id. at 841. In any event, insofar as the lower court's opinion in In re St. Jude Med., Inc. would require the application of Minnesota law to the Settlement Class, the Court is unpersuaded, for the reasons stated above-the-line.

turns to the predominance inquiry under Rule 23(b)(3). That inquiry "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." Amchem Prods., 521 U.S. at 623. The predominance requirement is met where the legal or factual questions subject to generalized proof "are more substantial than the issues subject only to individualized proof." Moore v. PaineWebber, Inc., 306 F.3d 1247, 1253 (2d Cir. 2002) (citation omitted). Although the predominance requirement is "readily met in certain cases alleging consumer . . . fraud," Amchem Prods., 521 U.S. at 625, the presence of individualized issues regarding the necessity of proving reliance, see McLaughlin, 522 F.3d 222-25, or the underlying applicable law, see In re Zyprexa Prods. Liability Litig., 04 Md. 1596, 2008 WL 2696916, at *138 (E.D.N.Y. July 2, 2008), may preclude a finding of predominance.

Here, because the plaintiffs' allegations of fraud focus on the defendants' uniform course of conduct in the design, rating, marketing, sale, and re-rating of GTA:SA, there are many issues of fact and law common to the Settlement Class. Such common issues include, but are not limited to: (1) whether GTA:SA, as produced and sold by the defendants before July 20, 2005, contained the Sex Minigame; (2) whether gamers could easily access the Sex Minigame through the Hot Coffee Mod; (3) whether the defendants violated the ESRB's rules by not informing that

34

entity of the presence of the Sex Minigame in GTA:SA's code during the initial ratings process; (4) whether the packaging for GTA:SA discs bore an "M" rating before July 20, 2005; (5) whether, given the presence of the Sex Minigame, the packaging for GTA:SA discs should have borne an "AO" rating before July 20, 2005; and (6) whether the ESRB changed the rating of GTA:SA to "AO" on July 20, 2005. In short, the defendants' uniform course of allegedly misleading conduct is at the heart of the litigation.

Nevertheless, because reliance is an element of consumer fraud in some states, see Tex. Bus. & Com. Code § 17.50(a)(1)(B) (Vernon 2005) (providing that consumer may maintain action for deceptive practice upon which he relied to his detriment); Wyo. Stat. Ann. § 40-12-108(a) (2008) ("A person relying upon an uncured unlawful deceptive trade practice may bring an action under this act . . . ."); see Lynas v. Williams, 454 S.E.2d 570, 574 (Ga. App. 1995) (holding that justifiable reliance is an element of deceptive practices); Feeney v. Disston Manor Personal Care Home, Inc., 849 A.2d 590, 597 (Pa. Super. 2004) (indicating that justifiable reliance is an element of deceptive practices),[22] the alleged uniformity of the defendants'

---

[22] The defendants claim (Defs.' Opp'n Class Cert. 28 & n.14) that several other states' consumer-protection statutes contain causation requirements that mimic reliance. See also Mary Dee Pridgen, Consumer Protection and the Law § 3.14 (Oct. 2007),

fraudulent conduct is insufficient, on its own, to justify a finding of predominance, see McLaughlin, 522 F.3d at 223 ("But proof of misrepresentation--even widespread and uniform misrepresentation--only satisfies half the equation; the other half, reliance on the misrepresentation, cannot be subject to general proof.")

In the sections that follow, the Court holds that the plaintiffs have failed to show that issues common to the Settlement Class predominate over individualized issues. In Part II.B.1, the Court rules that this case is controlled by McLaughlin, which decertified a nationwide class due to individualized reliance issues, 522 F.3d at 222-26. Further, in Part II.B.2, the Court finds that the Settlement Class is plagued by additional individualized issues beyond the reliance issues identified by McLaughlin. Therefore, the Court decertifies the Settlement Class.

### 1. **McLaughlin** Precludes Certification of Settlement Class

In McLaughlin, the plaintiffs contended that reliance could be proved on a class-wide basis because the defendants--much like the defendants to this action--marketed their Light cigarettes in a consistent, singular, uniform fashion. See 522

---

available on Westlaw at CONPROT § 3:14 (indicating that reliance or reliance-mimicking causation requirements are elements of consumer fraud in many states).

F.3d at 223.[23]  The Second Circuit determined, however, that
"[i]ndividualized proof [was] needed to overcome the possibility
that a member of the purported class purchased Lights for some
reason other than the belief that Lights were a healthier
alternative . . . ." Id. After finding that the fraud-on-the-
market presumption of reliance is inapplicable outside the
securities context, id. at 224, the Second Circuit held that
smokers of Light cigarettes could have elected to purchase such
cigarettes "for any number of reasons, including a preference
for the taste and a feeling that smoking Lights was cool," id.
at 225 (internal quotation marks and citation omitted). Hence,
the Second Circuit found that reliance was "too individualized
to admit of common proof." Id.

    Likewise, in the instant case, members of the Settlement
Class may have purchased GTA:SA for any number of reasons other
than its "M" rating, including because they hoped the game would
contain sex, violence, and other controversial content in
abundance. Indeed, the defendants introduced expert evidence

---

[23]  The Second Circuit determined that reliance was an
element of a civil-RICO claim predicated upon mail or wire
fraud. McLaughlin, 522 F.3d at 222. The Supreme Court recently
ruled that plaintiffs need not prove reliance in order to have a
valid civil-RICO claim whose predicate act is mail or wire
fraud, Bridge v. Phoenix Bond & Indem. Co., 128 S. Ct. 2131,
2138-39 (2008), thereby calling into question that portion of
the Second Circuit's reasoning in McLaughlin. Nevertheless, the
Supreme Court's decision in Bridge leaves unaffected the Second
Circuit's discussion of reliance, as it impacts the predominance
inquiry.

tending to show that an overwhelming majority--perhaps as many three-quarters--of GTA:SA purchasers did not consider the game's content rating at the time they made their purchase. (Defs.' Opp'n Class Cert., Declaration of Eugene Pennell Ericksen, Ex. A ("Ericksen Report"), at 15-16). Regardless of the admissibility or accuracy of this expert evidence,[24] its existence demonstrates that individualized issues pertaining to reliance are in dispute. Furthermore, the plaintiffs have failed to come forward with any evidence of their own conclusively showing that most or all Settlement Class members relied upon GTA:SA's content rating when they purchased the game. Cf. McLaughlin, 522 F.3d at 225 n.6 (noting that plaintiffs had produced an expert report claiming that 90.1% of those individuals who smoked Lights did so because of purported health benefits, but discounting claim as unreliable).

The McLaughlin decision leaves open the possibility of certifying a putative class action in which individualized reliance would be an issue, though it declines to clarify what characteristics such a class might possess. Id. at 224-25 (refusing to adopt Fifth Circuit's per se bar on certification of fraud actions involving individualized reliance issues). The Court is unpersuaded, however, that there are relevant

---

[24] The plaintiffs have moved to strike the Ericksen Report. 06 Md. 1739 (SWK) (MHD), Dkt. No. 56.

distinctions between the McLaughlin class and the Settlement
Class. To be sure, this litigation involves one product and one
alleged misstatement, i.e., the "M"-content rating borne by
GTA:SA before July 20, 2005, whereas McLaughlin involved an
alleged industry-wide scheme to mislead Light-cigarette smokers
about the health benefits of Lights through various
advertisements and other public statements over several decades,
see Schwab v. Philip Morris USA, Inc., 449 F. Supp. 2d 992,
1028-29 (E.D.N.Y. 2006). Nevertheless, the McLaughlin decision
did not rest on the multiplicity of allegedly false statements
promulgated by the defendants, or on the diverse range of
products involved. In fact, the decision assumed that the
defendants had misrepresented that Lights were healthier than
full-flavored cigarettes, see McLaughlin, 522 F.3d at 220 n.2,
and did not question the plaintiffs' claim that the defendants
had acted uniformly with respect to members of the putative
class, see id. at 223. Accordingly, the singularity and
uniformity of the fraud alleged in this case provide no reason
to distinguish McLaughlin.

Furthermore, the Court perceives no persuasive ground to
afford the plaintiffs in this matter a presumption of reliance
that was denied to the plaintiffs in McLaughlin, see id. at 224
(declining to apply securities-fraud presumption of reliance).
There is no reason to conclude that a GTA:SA purchaser would be

more likely to rely upon the game's rating than a Light-cigarette purchaser would be to rely upon Light cigarettes' purported health benefits. Indeed, health benefits are arguably more related to Light cigarettes' represented function than GTA:SA's content rating is to the game. Thus, one might expect a smoker to rely more upon Light cigarettes' represented health benefits than a gamer would rely upon GTA:SA's "M" rating. In any event, the Court can conceive of no reason or authority to grant the plaintiffs in this matter the benefit of a presumption of reliance not afforded the plaintiffs in McLaughlin.

In addition, the fact that the plaintiffs in this matter seek certification of a settlement class is no ground to distinguish McLaughlin, which involved a putative litigation class. During the preliminary fairness hearing, defense counsel argued that the Settlement was "devised . . . creatively to duck the predominance question." (Tr. 7, Nov. 28, 2007). The predominance inquiry, however, "trains on the legal or factual questions that qualify each class member's case as a genuine controversy, questions that preexist any settlement." Amchem Prods., 521 U.S. at 623. Accordingly, the Settlement does not relieve the Court of its duty to perform a robust analysis of the plaintiffs' predominance showing. See Amchem Prods., 521 U.S. at 620 (indicating that specifications of Rule 23 other than trial-manageability requirement "demand undiluted, even

40

heightened, attention in the settlement context"); Denney, 443
F.3d at 270 (holding that strictures of Rule 23 should not be
loosened because of settlement); In re Warfarin Sodium Antitrust
Litig., 391 F.3d 516, 529-30 (3d Cir. 2004) (ruling that
specifications of Rule 23 other than trial-manageability inquiry
must be observed in case of settlement class). Furthermore,
though Lead Counsel argued during the preliminary fairness
hearing that reliance issues related only to the trial-
manageability prong of Rule 23 (Tr. 10, Nov. 28, 2007), the
Second Circuit has since clarified that individualized issues of
reliance impact the predominance inquiry as well, McLaughlin,
522 F.3d at 222-26. Indeed, the McLaughlin decision focuses
exclusively upon the predominance question in holding that the
individualized reliance rendered class certification
inappropriate. Id. at 222. Therefore, the plaintiffs' request
for certification of a settlement class, rather than a
litigation class, does not bring this case outside McLaughlin's
ambit.

       Further, the fact that only some states' consumer-fraud
laws require proof of reliance does not mitigate the effect of
individualized reliance issues. As an initial matter, it appears
that many states' consumer-fraud statutes require proof of
reliance or proof of reliance-mimicking causation elements. See
Mary Dee Pridgen, Consumer Protection and the Law § 3.14 (Oct.

2007), <u>available on Westlaw at</u> CONPROT § 3:14. More importantly, the plaintiffs have requested certification of a nationwide class, including members who purchased <u>GTA:SA</u> in reliance states, and they cannot now ask the Court to turn a blind eye to these individuals' substantive claims. <u>Cf.</u> <u>Chin</u>, 182 F.R.D. at 458-59 (stating that plaintiffs had bypassed potential opportunities to simplify class and make certification more feasible); <u>Ford Ignition Switch</u>, 174 F.R.D. at 350 (same). Because individualized reliance issues attach to the consumer-fraud claims of thousands, if not millions, of Settlement Class members, the differing state-law treatment of reliance is no reason to distinguish <u>McLaughlin</u>. <u>Cf.</u> <u>In re St. Jude Med., Inc.</u>, 522 F.3d at 839-40 (decertifying putative nationwide class action on grounds that reliance element of Minnesota's consumer-fraud statute precluded finding that common issues predominated).

Accordingly, the Second Circuit's holding in <u>McLaughlin</u> requires the decertification of the Settlement Class.

## 2. There Are Substantial Individualized Issues Other Than the Reliance Issues Identified by <u>McLaughlin</u>

Even assuming that <u>McLaughlin</u> does not necessarily demand decertification here, there are substantial individualized issues other than the reliance issues present in <u>McLaughlin</u> that counsel in favor of decertification. First, certain elements of

Settlement Class members' underlying causes of action inject individualized issues other than reliance into this litigation. Specifically, the consumer-fraud laws of some states require proof of an ascertainable monetary loss, which substantially confounds the predominance question. Additionally, the equitable defense of unclean hands, which may bar some Settlement Class members' claims for unjust enrichment, also creates individualized issues concerning the conduct of particular Settlement Class members. Second, there are many differences in the underlying state laws applicable to Settlement Class members' claims, which ultimately calls into question the cohesiveness of the Class.

### a. Further Individualized Issues Arise from Other Elements of Underlying Consumer-Protection Law

Several states require that plaintiffs demonstrate an ascertainable loss of money or property in order to state a claim for consumer fraud. See, e.g., Ala. Code § 8-19-10(a) (2008) (requiring showing of "monetary damage to another person"); Conn. Gen. Stat. Ann. § 41-110g(a) (West 2007) (requiring showing of "ascertainable loss of money or property"); Idaho Code Ann. § 48-608(1) (2008) (requiring proof of "ascertainable loss of money or property"); 73 Pa. Stat. Ann. § 201-9.2(a) (2008) (providing private cause of action to consumers who suffer "ascertainable loss of money or property").

43

Like the reliance requirement, the ascertainable-loss requirement may create individualized issues that bar the certification of a consumer-fraud class action. See Lester v. Percudani, 217 F.R.D. 345, 352 (M.D. Pa. 2003) (finding that ascertainable-loss element required individualized damages inquiry that defeated predominance); In re Rezulin Prods. Liab. Litig., 210 F.R.D. 61, 68-69 (S.D.N.Y. 2002) (finding that ascertainable-loss element required individualized inquiry into whether particular class members "got their money's worth").

Although the ascertainable-loss requirement may not bar certification where the defendant has engaged in a uniform practice of overcharging to which all class members were, by definition, exposed, see Allen v. Holiday Universal, 249 F.R.D. 166, 193 (E.D. Pa. 2008), where it is unclear that some or all class members suffered a measurable monetary harm, the ascertainable-loss requirement often precludes certification, see id. at 192-93. Here, the plaintiffs have conceded that GTA:SA purchasers obtained a properly-functioning product, with the possibly unwanted addition of the Sex Minigame. (Tr. 14, Nov. 28, 2007.) Further, the defendants have introduced evidence tending to show that very few Settlement Class members--perhaps as few as 15%--knew of the Sex Minigame's existence, let alone accessed it. (Ericksen Report 19, 26-29.) Though the plaintiffs challenge the admissibility and accuracy of this evidence, see

06 Md. 1739 (SWK) (MHD), Dkt. No. 56, the Ericksen Report at the very least demonstrates that the question of whether Settlement Class members suffered an actual, ascertainable loss is very much in dispute. Moreover, the Court must decline the defendants' invitation (Tr. 7, Nov. 28, 2007) to ignore this dispute, which bears upon the predominance inquiry, simply because the parties have agreed to a settlement that allegedly obviates the need for an individualized damages inquiry. See Amchem Prods., 521 U.S. at 623. Accordingly, the ascertainable-loss requirement found in many states' consumer-fraud laws adds further individualized issues to the Settlement Class. Cf. McLaughlin, 522 F.3d at 231-32 (noting that although class may be certified despite individualized damages issues, courts should still consider damages issues when conducting predominance inquiry, and finding that individualized damages issues weighed against predominance finding in that case).

In addition, the plaintiffs' claims of unjust enrichment give rise to the potential defense of unclean hands in at least some states. See, e.g., Las Vegas Fetish, 182 P.3d at 766-67 (acknowledging that unclean hands could be defense to unjust-enrichment claim but finding under facts of case that unclean-hands defense was unpersuasive); Melius v. Breslin, 846 N.Y.S.2d 645, 647 (N.Y. App. Div. 2007) (holding that claim for unjust enrichment was barred by doctrine of unclean hands); Hollifield

45

v. Monte Vista Biblical Gardens, Inc., 553 S.E.2d 662, 670 (Ga. Ct. App. 2001) (dismissing claim for unjust enrichment partly on ground of unclean hands). Leaving aside whether the law of unjust enrichment and the doctrine of unclean hands are uniform in the fifty states, the unclean-hands defense undoubtedly introduces significant individualized issues into this litigation, see Clay, 188 F.R.D. at 500-01 n.5 (indicating that unclean-hands defense would require individualized inquiry into whether particular putative class members should be barred from recovery on ground that they acted inequitably). In particular, Settlement Class members could only access the Sex Minigame if they, or some third-party user other than the defendants, deliberately modified GTA:SA's code. Because the modification of GTA:SA's code may violate the game's End User License Agreement, and in any event, as such conduct is generally deliberate and willful, Settlement Class members who modified GTA:SA to view the Sex Minigame may be barred from invoking this Court's equitable jurisdiction. As such, the presence of a colorable unclean-hands defense in the instant case may necessitate a particularized inquiry into the circumstances under which Settlement Class members purchased and used GTA:SA, thereby injecting substantial individualized issues into this litigation. See In re Sears, Roebuck & Co. Tools Mktg. & Sales Practices Litig., Mdl. No. 1703, 2007 WL 4287511, at *9 (N.D.

Ill. Dec. 4, 2007) (refusing to certify unjust-enrichment class on ground that claim required individualized inquiry into putative class members' situations).

        **b. State-Law Differences Compound Existing Individualized Issues**

The differing state laws applicable to Settlement Class members' claims compound the individualized issues identified above. See Amchem Prods., 521 U.S. at 624 (indicating that differences in applicable state law compound other individualized issues). In particular, the differing state consumer-protection laws make certain issues relevant to some Settlement Class members, but not others. Accordingly, differences in the pertinent state consumer-protection laws undermine the cohesiveness of the Settlement Class, and raise concerns regarding the propriety of grouping individuals with distinctly different substantive claims in a single nationwide class. See In re Zyprexa, 2008 WL 2696916, at *138 (tentatively holding that differences in state consumer-protection laws precluded finding of predominance) (citations omitted).

Many courts have determined that differences in the underlying state laws applicable to individual putative class members' consumer-protection claims preclude a finding of predominance. See, e.g., In re Zyprexa, 2008 WL 2696916, at *138 (tentatively holding, inter alia, that differences in state

consumer-practices laws defeated predominance); Dex-Cool, 241 F.R.D. at 315 (holding, inter alia, that differences in state express-warranty laws defeated predominance requirement); In re Ford Motor Co. Ignition Switch Prods. Liability Litig., 194 F.R.D. 484, 489-91 (D.N.J. 2000) (finding, inter alia, that differences in states' consumer-protection laws defeated predominance, even under proposed grouping of similar state laws); Chin, 182 F.R.D. at 457-62 (ruling, inter alia, that differences in state consumer-fraud and warranty laws defeated predominance); In re Ford Motor Co. Vehicle Paint Litig., 182 F.R.D. 214, 222-24 (E.D. La. 1998) (holding, inter alia, that differences in state fraudulent-concealment laws defeated predominance); Clement v. Am. Honda Fin. Corp., 176 F.R.D. 15, 23 (D. Conn. 1997) (ruling, inter alia, that differences in state unfair-trade-practices laws defeated predominance); Ford Ignition Switch, 174 F.R.D. at 349-51 (finding, inter alia, that differences in states' consumer-protection laws defeated predominance); In re Masonite Corp. Hardboard Siding Prods. Liability Litig., 170 F.R.D. 417, 423-24 (E.D. La. 1997) (holding, inter alia, that differences in state products-liability laws defeated predominance).

Other courts, however, have found the predominance requirement to be satisfied despite differences in the underlying state laws applicable to putative class members'

claims. _See, e.g._, _In re Warfarin_, 391 F.3d at 529-30 (holding that plaintiffs met predominance requirement where they alleged that drug manufacturer violated fifty states' laws by misleading class members about generic alternatives to manufacturer's brand-name drugs); _In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions_, 148 F.3d 283, 314-15 (3d Cir. 1998) (holding that plaintiffs satisfied predominance requirement where they alleged that defendants engaged in deceptive marketing and sales of insurance policies, in violation of, _inter alia_, various states' consumer-fraud laws); _Desantis v. Snap-On Tools Co._, 06 Cv. 2231 (DMC), 2006 WL 3068584, at *4 (D.N.J. Oct. 27, 2006) (holding that plaintiffs fulfilled predominance requirement where they alleged that defendant engaged in common course of deceptive business practices); _Varacallo v. Mass. Mut. Life. Ins. Co._, 226 F.R.D. 207, 230-32 (D.N.J. 2005) (holding that plaintiffs satisfied predominance requirement where they alleged that defendants violated state deceptive-practices laws through misleading marketing of insurance policies); _O'Keefe v. Mercedes-Benz USA, LLC_, 214 F.R.D. 266, 290-91 (E.D. Pa. 2003) (holding that plaintiffs satisfied predominance inquiry where they alleged, _inter alia_, that defendants violated states' unfair-trade-practices law by engaging in common course of fraud); _Manners v. Am. Gen. Life Ins. Co._, 98 Cv. 0266:3, 1999 WL 33581944, at *16-*17 (M.D.

49

Tenn. Aug. 11, 1999) (holding that plaintiffs satisfied predominance requirement where they alleged, inter alia, that defendants violated state law by deceptively marketing insurance policies); In re Mfrs. Life Ins. Co. Premium Litig., 96 Cv. 230 (BTM) (AJB), 1998 WL 1993385, at *3 (S.D. Cal. Dec. 21, 1998) (holding that plaintiffs satisfied predominance requirement where they alleged that defendants violated states' consumer-protection statutes by deceptively marketing insurance policies).

A common distinction separating these two lines of cases is the presence or absence of a settlement. In particular, those courts faced with a putative settlement class more frequently determined that the predominance test was met. But see Clement, 176 F.R.D. at 23 (decertifying settlement class on ground that differences in state unfair-trade-practices laws defeated predominance). Nevertheless, the predominance inquiry--as distinguished from the trial-manageability inquiry--should not be watered down merely because the parties have entered a proposed settlement. See Amchem Prods., 521 U.S. at 620; Denney, 443 F.3d at 270; In re Warfarin, 391 F.3d at 529-30. Under the facts of this case, differences in the applicable state laws go to the heart of Settlement Class members' substantive claims, and thus undermine the Settlement Class's cohesiveness.

Therefore, certification of the Settlement Class is especially inappropriate, despite the existence of the Settlement.

Individual Settlement Class members face distinctly different potential legal obstacles to recovery. For example, the reliance issue is irrelevant to Settlement Class members from states not requiring a showing of reliance to make out a claim for consumer fraud, see, e.g., Kan. Stat. Ann. § 50-626(b) (2007) (indicating that seller may commit deceptive act "whether or not any consumer has in fact been misled"); N.J. Stat. Ann. § 56:8-2 (West 2008) (indicating that seller may commit deceptive act "whether or not any person has in fact been misled, deceived or damaged thereby"); S&R Assocs., L.P. v. Shell Oil Co., 725 A.2d 431, 440 (Del. Super. Ct. 1998) (indicating that actual reliance is not an element of statutory consumer fraud); State ex rel. Corbin v. Tolleson, 773 P.2d 490, 503 (Ariz. Ct. App. 1989) ("Reliance is not an element of consumer fraud."), while reliance is of the essence to those Class members who purchased GTA:SA in reliance states, see, e.g., Tex. Bus. & Com. Code § 17.50(a)(1)(B) (Vernon 2005); Wyo. Stat. Ann. § 40-12-108(a) (2008). (See also Pls.' Mot. Class Cert., Declaration of Andrew P. Bell ("Bell Decl.") Ex. 18 (evaluating states' consumer-fraud laws with reference to scienter, reliance, and relief available).)

Likewise, the defendants' scienter is of no concern to Settlement Class members from states not requiring a scienter showing, see, e.g., Small v. Lorillard Tobacco Co., 720 N.E.2d 892, 897 (N.Y. 1999) (indicating that intent to defraud is not an element of consumer fraud in New York); Kessler v. Fanning, 953 S.W.2d 515, 521 (Tex. App. 1997) (stating that plaintiff need not prove seller's knowledge of affirmative statement's falsity because law presumes that defendant knows whether affirmative statement was true), while the defendants' knowledge or intent--as the case may be depending on the relevant state law--is of central importance to members from scienter states, see, e.g., Colo. Rev. Stat. Ann. § 6-1-105(1)(u) (West 2008) (requiring showing of "inten[t] to induce the consumer to enter into a transaction"), Nev. Rev. Stat. Ann. § 598.0979(1) (West 2008) (requiring showing of knowledge); Dodson v. U-Needa Self Storage, LLC, 96 P.3d 667, 671 (Kan. Ct. App. 2004) (requiring showing that defendant perpetrated fraud "knowingly or with reason to know"); Sam v. Beaird, 685 So. 2d 742, 744 (Ala. Civ. App. 1996) (requiring showing of "some knowledge of false or deceptive conduct"). (See Bell Decl. Ex. 18 (setting forth fifty-state analysis of scienter requirement).).

Similarly, many Settlement Class members must show that they suffered an ascertainable monetary loss, see, e.g., Ala. Code § 8-19-10(a) (2008); Conn. Gen. Stat. Ann. § 41-110g(a)

(West 2007); Idaho Code Ann. § 48-608(1) (2008); 73 Pa. Stat. Ann. § 201-9.2(a) (2008), whereas other Class members face no such requirement, see, e.g., Kan. Stat. Ann. § 50-634(a), (b) (2007) (providing individual cause of action to "aggrieved" consumers, whether or not they have suffered damages).

Further, some Settlement Class members are apparently barred from participating in any consumer-fraud class action, let alone this one, see, e.g., see Ala. Code § 8-19-10(f) (2008); Ga. Code. Ann. § 10-1-399(a) (West 2007); La. Rev. Stat. Ann. § 51:1409(A) (2008); Miss. Code Ann. § 75-24-15(4) (West 2007); Mont. Code Ann. § 30-14-133(1) (2007); Arnold v. Microsoft Corp., 00 Cv. 123, 2001 WL 193765, at *6 (Ky. Cir. Ct. July 21, 2000) (holding that relevant Kentucky consumer-fraud provision does not permit class-action suit), while other Settlement Class members must notify the state Attorney General, see, e.g., Kan. Stat. Ann. § 50-634(g) (2007); Mo. Ann. Stat. 407.025(7) (West 2008); N.J. Stat. Ann. § 56:8-20 (West 2008); Or. Rev. Stat. Ann. § 646.638(2) (West 2007); Wash. Rev. Code Ann. § 19.86.095 (West 2008), or the defendant, see, e.g., Ala. Code § 8-19-10(e) (2008); Alaska Stat. Ann. § 45.50.535(b)(1) (West 2008); Cal. Civ. Code § 1782(a)(1) (West 2008); Ga. Code Ann. § 10-1-399(b) (West 2007); Ind. Code Ann. § 24-5-0.5-5(a) (West 2008); Me. Rev. Stat. Ann. tit. 5, § 213(1-A) (2008); Mass. Gen. Laws Ann. ch. 93A, § 9(3) (West 2008); Tex. Bus. &

Com. Code Ann. §§ 17.505 (Vernon 2007); Wyo. Stat. Ann. §§ 40-12-109, 40-12-102(a)(ix) (West 2008), of the imminence, filing, or pendency of an action for consumer fraud.[25] Of course, these are non-issues for Settlement Class members from states whose laws contain no such restrictions. See, e.g., Conn. Gen. Stat. Ann. § 42-110h (West 2007) (contemplating maintenance of consumer-fraud class action); Utah Code Ann. § 13-11-20(1) (West 2008) (setting forth prerequisites for maintenance of consumer-fraud class action).

Moreover, because Settlement Class members did not purchase GTA:SA directly from the defendants, the privity requirement would bar the breach-of-warranty claims of Class members from eighteen states, see, e.g., Adirondack Combustion Techs., Inc. v. Unicontrol, Inc., 793 N.Y.S.2d 576, 579 (N.Y. App. Div. 2005) (citation omitted); Flory v. Silvercrest Indus., Inc., 633 P.2d 383, 387 (Ariz. 1981); Rodrigues v. Campbell Indus., 87 Cal.

---

[25] Although failure to comply with some of these notice requirements may not erect an insurmountable barrier to Settlement Class members' claims, see, e.g., Pointer v. Edward L. Kuhs Co., 678 S.W.2d 836, 842 (Mo. Ct. App. 1984); Kan. Stat. Ann. § 50-634(g) (2007); Or. Rev. Stat. Ann. § 646.638(2) (West 2007), noncompliance with other states' notice requirements may bar certain Settlement Class members' claims, see In re Pharm. Indus. Average Wholesale Price Litig., 230 F.R.D. at 84-85 (refusing to certify consumer-fraud class action as to those individuals whose claims arise under states with notice requirements). Here, the plaintiffs have not introduced any evidence that Settlement Class members from those states imposing notice requirements have complied with such requirements.

App. 3d 494, 500 (Cal Ct. App. 1978), but privity is irrelevant to the claims of Settlement Class members from other states, see, e.g., Streich v. Hilton-Davis, 692 P.2d 440, 448 (Mont. 1984); Cameo Curtains, Inc. v. Philip Carey Corp., 416 N.E.2d 995, 998 (Mass. App. Ct. 1981); Indus. Graphics, Inc., 485 F. Supp. at 800. (See Bell Decl. Ex. 20 (conceding that eighteen states require proof of privity, while other thirty-two do not).)

Therefore, differences in the state laws applicable to Settlement Class members' claims create significant questions concerning the cohesiveness of the Settlement Class. In particular, it is not at all clear that an individual who must prove reliance, or demonstrate an ascertainable loss, or show privity, should be grouped in the same class with another individual whose claims must meet none of these requirements.

In summary, the Settlement Class is plagued by individualized issues arising from the requirement, found in several state laws, that purchasers prove that they actually relied upon an alleged misrepresentation in order to state a claim for consumer fraud. To these individualized issues, the Court must add the potentially particularized issues arising from the ascertainable-loss requirement found in some consumer-fraud statutes, and the unclean-hands defense to unjust enrichment. These substantial individualized issues are only

compounded by the differing legal obstacles to Settlement Class members' recovery, resulting from relevant distinctions in the states' consumer-protection laws. Under these circumstances, the Court follows McLaughlin and holds that the plaintiffs have failed to show that the Settlement Class is sufficiently cohesive to warrant certification. Accordingly, the Court decertifies the Settlement Class.

## III. Conclusion

For the foregoing reasons, the Court decertifies the Settlement Class. Consequently, the Court has no occasion to address the fairness of the Settlement, which was contingent upon the maintenance of the Settlement Class's certification.[26]

---

[26] In light of the Court's holding that the Settlement Class fails the predominance test, it need not address the other certification requirements, or the fairness of the Settlement. Nevertheless, the Court notes that there are important questions concerning the adequacy of the Settlement Class's representation and the fairness of the Settlement--questions that would require careful scrutiny. In particular, the Settlement provides benefits only to those Class members who swear under penalty of perjury that they were offended by consumers' ability to access the Sex Minigame, but offers no recovery to Settlement Class members who will not make this asseveration. The parties have not demonstrated, however, that "taking offense" is an element of any of the underlying claims advanced by the plaintiffs. Although it is not immediately clear that the individual Class Representatives took offense at the presence of the Sex Minigame in GTA:SA's code, the terms of the Settlement raise the specter that the Class Representatives negotiated a settlement that would benefit Settlement Class members like themselves, who were offended, at the expense of other Class members who were not offended, but who nonetheless possess potentially meritorious claims. This specter creates questions concerning the adequacy-of-representation element of Rule 23(a)(4). See Amchem Prods.,

The Court is mindful that the parties expended great time
and resources in reaching the Settlement, providing notice to
the Settlement Class, and processing claims. The Court is also
sensitive to the possibility that more actions of this kind will
make their way into the federal courts with the advent of the
Class Action Fairness Act of 2005, Pub. L. No. 109-2, 199 Stat.
4 (Feb. 18, 2005). (Tr. 25, June 25, 2008). In addition, the
Court is aware that the Second Circuit may be more deferential
in its review of a decision certifying a class than in its
review of a decision denying certification. See, e.g., Parker v.
Time Warner Entm't Co., 331 F.3d 13, 18 (2d Cir. 2003) ("An
appellate court is noticeably less deferential when the district
court has denied class status than when it has certified a
class.") (internal quotation marks, alterations, and citations
omitted). Nevertheless, the Court may not, on the basis of these
considerations, loosen the strictures of class certification.
Litigation by representation requires the definition of a
cohesive class, even if the ultimate goal is to settle that
litigation before trial. Amchem Prods., 521 U.S. at 623. In

---

521 U.S. at 626-27 (decertifying class of asbestos plaintiffs on
grounds that currently-injured class members had intractable
conflict of interest with exposure-only class members).
Moreover, the Settlement's division of Settlement Class members
on a basis that bears little relationship to their underlying
claims, i.e., by operation of the "take offense" oath, calls
into question whether the Settlement is fair to those who are
disadvantaged thereby.

light of the Second Circuit's recent decision in <u>McLaughlin</u>, 522 F.3d at 222-26, the Settlement Class does not possess the requisite cohesiveness. Therefore, the Court must decertify.

The parties shall meet and confer to determine how this multidistrict litigation shall proceed. On or before September 5, 2008, the parties shall jointly file a proposed plan for the resolution of this litigation, which sets forth, at a minimum, a tentative schedule for the filing of any future motion(s) for class certification. If the parties are unable to formulate a plan by September 5, 2008, they shall file a brief statement explaining the grounds for their inability to reach an agreement, and shall request a date for a conference with the Court. In either event, after the Court has received the parties' submission, it shall determine whether a conference is necessary, and if so, set a conference date.

SO ORDERED.

_____
    SHIRLEY WOHL KRAM
UNITED STATES DISTRICT JUDGE


Dated:    New York, New York
          July 30, 2008

light of the Second Circuit's recent decision in McLaughlin, 522 F.3d at 222-26, the Settlement Class does not possess the requisite cohesiveness. Therefore, the Court must decertify.

The parties shall meet and confer to determine how this multidistrict litigation shall proceed. On or before September 5, 2008, the parties shall jointly file a proposed plan for the resolution of this litigation, which sets forth, at a minimum, a tentative schedule for the filing of any future motion(s) for class certification. If the parties are unable to formulate a plan by September 5, 2008, they shall file a brief statement explaining the grounds for their inability to reach an agreement, and shall request a date for a conference with the Court. In either event, after the Court has received the parties' submission, it shall determine whether a conference is necessary, and if so, set a conference date.

SO ORDERED.

SHIRLEY WOHL KRAM
UNITED STATES DISTRICT JUDGE

Dated:   New York, New York
         July 30, 2008

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 7/30/08

58